Valencia WALKER, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 83–3363.

United States District Court,
District of Columbia.

Jan. 11, 1985.

Harlow R. Case, Washington, D.C., for plaintiff.

John H.E. Bayly, Jr., Asst. U.S. Atty., Washington, D.C., for defendant.

## DECISION AND ORDER

JACKSON, District Judge.

This is an action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.*, by four-year-old Steven H. Walker and his mother, Valencia Walker, for medical malpractice alleged to have occurred in the course of Steven's birth at the Walter Reed Army Medical Center in November of 1980. Plaintiffs claim that the hospital, acting by its resident physician who managed Valencia Walker's labor and delivery, was negligent in allowing the mother's labor to proceed in such a manner that a low forceps delivery became necessary which, in turn, although properly performed, necessarily inflicted traumatic injury to a facial nerve on the infant's left side. Upon the facts found as hereinafter set forth in accordance with Fed.R.Civ.P. 52(a), following trial without jury, and the conclusions of law drawn therefrom, for the reasons stated the Court will enter judgment for defendant.

### I.

Valencia Walker, a military wife in the final month of her first pregnancy to be carried to term, presented at the obstetrics ward of Walter Reed Army Medical Center shortly before midnight, November 17, 1980. Her contractions had begun at approximately 10:00 p.m., and her membranes had ruptured spontaneously immediately prior to admission. Upon admission her cervix was found to have dilated to four centimeters and was completely effaced. The baby was at the minus two station.

Shortly after admission she was seen by Franklin Crane, M.D., the first-year resident in obstetrics who would manage her

through to a vaginal delivery a few minutes after 2:00 a.m. Upon his initial examination Dr. Crane made two findings of particular significance to him: Ms. Walker's vaginal discharge contained meconium of "pea soup" consistency, and "decelerations" in fetal heart tones were auscultated by fetascope. Dr. Crane concluded that the baby's status should be followed continuously by internal fetal monitor, in his words, "as soon as possible!", and he made a progress note to that effect which, unfortunately, he failed both to time and to implement.[1] By interpolation and inference, however, it is reasonably clear that Dr. Crane had completed his evaluation of Ms. Walker and determined an internal fetal monitor to be indicated at about 12:35 a.m. An external monitor lead was placed about Ms. Walker's abdomen at approximately that time, but it was not until 1:30 a.m. that Dr. Crane attached the internal monitor lead to the baby's scalp. Fetal heart rate was recorded at that moment as 147, but sometime between 1:30 and 1:45 a.m., Dr. Crane perceived (presumably from the internal monitor) patterns of fetal heart rate decelerations he described as "mixed/variable," and at least one episode of fetal tachycardia (to 190), which he characterized on his own as "fetal distress." At 1:45 a.m. he ordered Ms. Walker taken to the delivery room where, at 2:04 a.m., he delivered Steven, using low forceps and making a midline episiotomy under local anesthesia.

Steven Walker weighed slightly more than five pounds at birth. The umbilical cord was wrapped once about his neck. His Apgar scores were seven and eight (at one and five minutes, respectively), and he bore no superficial evidence of trauma secondary to the application of the forceps.

Steven's in-hospital postnatal record does not reflect any evidence of facial nerve pathology. However, at an early outpatient clinic visit on December 10, 1980, the examining pediatrician noted Steven to have an "asymmetry" of his mouth when crying. The condition, a lower motor neuron paralysis of a branch of the seventh facial nerve, known as "Bell's palsy," persists to this date. It is not noticeable except when Steven cries or laughs, and it is neither dysfunctional nor disfiguring; it is, however, perceptible, has not improved, and may be permanent. It is that injury for which plaintiffs make claim here. Steven Walker is otherwise apparently neurologically normal.

## II.

Plaintiffs contend that Steven's facial asymmetry is secondary to the trauma inflicted by the blade of Dr. Crane's forceps upon the left side of his head as he was being delivered.[2] They do not contend that Dr. Crane negligently manipulated the forceps or used excessive force; indeed, they concede that the use of forceps was indicated in the circumstances, and that some trauma unavoidably accompanies their use. They contend, rather, that Dr. Crane (and, through him, the defendant United States) was negligent in failing to attach the internal fetal monitor which Dr. Crane himself recognized as necessary to give early and accurate forewarning of conditions endangering the fetus. According to plaintiffs, Ms. Walker presented at the hospital in "high risk" circumstances: she was marginally premature; her membranes had ruptured spontaneously prior to admission; labor was progressing more rapidly than normally anticipated in a nulliparous patient; vaginal discharge showed "pea soup" meconium; and auscultation by fetascope suggested aberrant decelerations in

---

1. The medical record times are regrettably unreliable throughout, having been entered, as they were, by different people using unknown timepieces. At least one entry—a standard series of "labor orders"—appears to have been timed in advance of Dr. Crane's authorizing signature.

2. Defendant's neurological expert expressed his opinion that the condition is "developmental," not traumatic, in origin, and is merely a manifestation of a normal asymmetry which everyone possesses to some degree in various bodily parts. It is unnecessary here, however, to determine the etiology of Steven's seventh nerve paralysis.

fetal heart rate. Each condition is known on occasion to predispose to, portend, or accompany "fetal distress" (which, for purposes of this case, would occur upon an interruption in fetal oxygenation), although none of them, singly or in combination, indicates that fetal distress is actually present. Nevertheless, the need for careful monitoring is acknowledged by both sides, and it is for the hour or so when the more accurate internal fetal monitor was not in operation that plaintiffs seek to hold the hospital accountable. It is their theory that, during that period, actual fetal distress developed, to which Dr. Crane and the nurses were oblivious until it was finally detected upon insertion of the internal monitor, prompting a precipitous delivery *per* vagina (the only mode then available, the infant's head having engaged), with the use of forceps then being imperative to extract the baby as quickly as possible. Had the internal monitor been in place when it should have been, the plaintiffs contend, the fetal distress would have been detected earlier, when caesarean section remained not only a viable alternative but the treatment of choice.[3]

The hospital concedes that the internal monitor should have been inserted, as Dr. Crane noted, "as soon as possible." Assuming no more urgent demands upon Dr. Crane's time and attention intruded—and there is no evidence they did—reasonable care in the circumstances required him to insert the internal monitor lead immediately upon completion of his initial examination.[4] Nevertheless, the hospital says, nothing of significance occurred during the interval of a magnitude to justify a surgical delivery. Consequently, the failure to attach the internal monitor earlier did not result in a failure to do a caesarean section and is not, therefore, the proximate cause of any injury to Steven occurring in the course of the low forceps vaginal delivery.

### III.

The United States is liable under the Federal Tort Claims Act "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and its liability is to be determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2672. Under District of Columbia law a plaintiff in a medical malpractice case bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury. *Meek v. Shepard,* 484 A.2d 579 at 581 (D.C.1984). In cases such as this, expert testimony is necessary to prove both a departure from the standard of care and its causal connection with the harm complained of. *See Washington Hospital Center v. Martin,* 454 A.2d 306, 308 (D.C.1982); *Quick v. Thurston,* 290 F.2d 360, 362 (D.C.Cir.1961) (*en banc*).

Plaintiffs' expert evidence consisted of the testimony (by deposition) of Dr. Richard F. Morton, currently Associate Director of Medical Services for the March of Dimes Birth Defects Foundation in New York, but from 1956 through 1968 a practicing obstetrician (although not Board-certified) on the West Coast.[5] In Dr. Morton's opinion, Ms. Walker's meconium show and the fetal heart deceleration noted by Dr. Crane at 12:35 a.m. were, in and of themselves, indicative of fetal distress and mandated an

---

3. Forceps are usually unnecessary to remove an infant from the mother's womb *via* an abdominal incision.

4. During the night of November 17–18, 1980, Dr. Crane managed five deliveries—two of them premature breeches with complications—but he does not contend that he was overextended. Plaintiffs did not attempt to raise an issue of inadequate staffing prior to trial and, consequently, were not permitted to do so at trial.

5. Dr. Morton abandoned the practice of obstetrics more than a decade before this case presented. Since receiving a graduate degree in public health in 1971, he has been an academic professor of epidemiology and preventive medicine and has had no personal experience with fetal monitoring equipment which came into use after he left practice.

immediate, i.e., within 30 minutes, C-section as an "obstetrical emergency."

Plaintiffs' other expert, Dr. David C. Abramson, Board-certified in pediatrics and in peri- and neonatal medicine, was, from 1970 through 1978, Chairman of the Perinatal Medicine Division, Department of Pediatrics, at Georgetown University Medical Center. (He is currently Director of Emergency Medicine at a general hospital in suburban Washington, D.C.) In Dr. Abramson's opinion, Ms. Walker represented a "high risk" case, but not the obstetrical emergency perceived by Dr. Morton. Dr. Abramson believed that a "careful trial of labor" was appropriate (contemplating, of course, effective fetal monitoring). He could not say when, if ever, a C-section actually became necessary, however, because the fetal monitor tracings were not available for examination.[6] He found the failure to activate an internal fetal monitor, the need for it having been recognized by Dr. Crane, to have been below the standard of obstetrical care as he has observed it from the vantage point of a "member" of the perinatal "team" concerned primarily with fetal health.

Defendant's expert, Brocket Muir, Jr., M.D., has been a practicing obstetrician in the Washington, D.C., metropolitan area for over 17 years. He is Board-certified in obstetrics and gynecology, is a member of the clinical faculty at Georgetown University Medical Center, and delivers, he estimates, some 250–300 babies a year. To Dr. Muir, the findings on admission, namely, the presence of meconium and fetal heart rate decelerations, are of themselves of "little meaning." Decelerations, if corresponding to maternal contractions, are, in fact, "reassuring"; it is the loss of "beat-to-beat variability" in fetal heart rate, or "late" decelerations, i.e., those which follow (rather than coincide with) a contrac-

tion, which the profession regards as ominous. Meconium, even "pea soup" meconium, merely raises the "index of suspicion." While it can signify fetal distress, it does not invariably do so, nor is fetal distress always accompanied by meconium staining. All that was professionally required upon Ms. Walker's admission, according to Dr. Muir, was close monitoring, a fact recognized by Dr. Crane. Dr. Muir agreed with Dr. Abramson that, once the need for it was recognized, the failure to insert the internal monitor for an hour was substandard. He disagreed, however, with the suggestion that a caesarean section was indicated at any point in the labor. None of the signs which prompted Dr. Crane to order Ms. Walker to the delivery room and to perform the low forceps delivery were, in his opinion, diagnostic of fetal distress. At most, he said, they reflected a fetus "under stress" from any of the myriad sources accompanying the normal birth process, most likely, in this case, a transient hypoxia secondary to either the rapidity of the labor or the nuchal cord. But the most convincing evidence of record that fetal distress was never present, according to Dr. Muir, is Steven's elevated Apgar scores at birth, his normal postnatal course and (except for the peripheral nerve deficit) his normal neurological status today.

The Court credits the testimony of Dr. Muir to the extent of finding no true fetal distress to have occurred at any time during the course of Ms. Walker's labor when surgical delivery was an option, and, thus, no indication for a section ever to have been present, even if unperceived. The hospital record, such as it is, supports the finding. Although the fetal monitor tracings are missing, the nursing notes in the hospital record reflect that the external monitor was in operation from 12:30 a.m.

---

**6.** The fetal monitor tracings have not been located, but their absence does not give rise to adverse inferences. According to the secretary to the chief of the hospital's obstetric service who was assigned responsibility for cataloguing and microfilming a backlog of tracings in early 1980, the Valencia Walker tracings were among a number misplaced in the process, most likely never having been returned by the microfilming firm. There is, however, no evidence that they were deliberately destroyed, or that the hospital was less than reasonably diligent in attempting to locate them.

forward.[7] The fetal heart rate, recorded at half-hour intervals (presumably from the external monitor, possibly by fetascope) remained between 144 and 147, well within normal limits. Although fetal tachycardia and late decelerations were detected by Dr. Crane shortly after activation of the internal monitor at 1:30 a.m., upon the mother's arrival in the delivery room at 1:45 a.m. the fetal heart rate had returned to 147. Nineteen minutes later Ms. Walker delivered Steven, weighing five pounds one ounce. His Apgar scores of seven and eight were indicative of a normal, healthy child, which, save for the facial asymmetry, it is undisputed that Steven is today.

 Steven's immediate postnatal and current normal neurological status are the most persuasive evidence that the signs Dr. Crane suspected as indicating "fetal distress"—and, perhaps injudiciously, entered as such on the chart—were not, in fact, fetal distress at all. They were, most probably, the result of transient episodes of hypoxia related to the rapidity of labor and tension on the nuchal umbilical cord as the infant descended the birth canal, which did not commence until shortly before birth and were not of a duration sufficient to threaten permanent cerebral injury. The Court finds nothing to have occurred while the internal fetal monitor remained unconnected which would have indicated a caesarean section, even were Dr. Crane's failure to place it in operation deemed to have been negligent. Caesarean sections, presenting, as they do, significant risks for the mother, are generally not performed absent indications for them. Thus, the failure to attach the internal fetal monitor cannot be found to be the proximate cause of the failure to have delivered Steven Walker by caesarean section, nor, it necessarily follows, of any injury done to him in the course of the properly-performed low forceps vaginal delivery. The Court concludes that plaintiffs have failed to prove, by a preponderance of the evidence, that

defendant's failure to make timely connection of an internal fetal monitor was the proximate cause of such seventh cranial nerve deficit as Steven Walker possesses today, and it is, therefore, this 10th day of January, 1985,

ORDERED, that judgment be entered for defendant.

---

7. Ms. Walker remembers no monitoring of any sort until approximately 45 minutes before she delivered, but hospital routine required the use of external monitors (which are applied by nurses) in all cases, and the nursing notes affirmatively reflect an external monitor to have been in operation as of "0030 hrs."