Calvin THOMAS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 84–2999.

United States District Court,
District of Columbia.

April 30, 1987.

David E. Fox, Washington, D.C., for plaintiff.

George P. Williams, Asst. U.S. Atty., Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

The plaintiff, Calvin Thomas brings this medical malpractice action under the Federal Torts Claim Act, 28 U.S.C. § 1346(b), §§ 2671 *et seq.*, to recover for injuries sus-

tained as the result of the alleged negligence of employees of the Veterans Administration Medical Center ("VAMC") in Washington, D.C. After a bench trial in this matter, I make the following findings of fact and conclusions of law.[1]

*Findings of Fact*

1. Plaintiff, a 39 year old black male, went to the Veterans Administrations Medical Center in Washington, D.C. on October 5, 1983, complaining of an injury to his left hand.[2]

2. Plaintiff was initially seen in the hospital's emergency room. The emergency room physician believed the injury was serious enough to admit plaintiff to the hospital's orthopedic ward for observation and treatment. On his forwarding report, the admitting doctor diagnosed an infection and additionally directed the treating physician to "rule out compartment syndrome."[3]

3. Plaintiff spent a great deal of time at trial attempting to establish that he did in fact have compartment syndrome. I am not prepared, based on all of the evidence, to find that plaintiff did have compartment syndrome. However, regardless of whether the syndrome was present, once the admitting doctor made the notation to rule it out, a specific duty arose on the part of the doctors. The medical standard requires that when compartment syndrome is a possible diagnosis the patient must be reevaluated every 4 to 6 hours until the possibility of this condition is "ruled out."

4. Between October 5 and October 12, 1983, plaintiff remained in the hospital's Orthopedic Service and was treated with antibiotic medicine. There is no indication in the medical records that any single doctor was principally responsible for the plaintiff's medical care. He was seen by a number of different doctors during his stay.

5. Instead of getting better plaintiff's infection worsened and an "abscess" developed in the hand. This condition was not detected by the hospital staff until the morning of October 12.

6. Defendant contends that plaintiff's condition was not noticed until October 12th because there was no clinical manifestation until that time. Whether there was or was not a clinical manifestation before the 12th is difficult to reconstruct because of the paucity of the records kept on the plaintiff. Accordingly, I find that the condition was not detected until the morning of October 12, because during the October 5 through October 12 period, plaintiff's condition was not carefully monitored nor was his progress properly recorded. In this regard, defendant clearly breached its duty of care to the plaintiff.

a. During this time, he was examined by doctors no more than twice a day, and on one day, not at all.

b. The treating doctors detected a tingling in plaintiff's hand on October 7, 1983, but no steps were taken to determine the cause of this condition. If such steps had been taken, it would have alerted the examining staff to plaintiff's deteriorating condition substantially before it was discovered on October 12th.

---

1. Any finding of fact more properly denominated as a conclusion of law and vice versa shall be so considered.

2. Plaintiff is a partially disabled Vietnam war veteran who has had a great deal of difficulty adjusting to society subsequent to his discharge from the service. He has had difficulty holding a permanent job and has been a consistent recreational drug user. Defendant attempted to show at trial that the plaintiff's drug use was the cause of the hand injury for which he initially went to the VAMC, however the evidence is neither clear nor convincing. Most importantly, though, plaintiff's drug use is not material to the ultimate issue in this action—which is whether the plaintiff was treated according to proper medical standards once arriving at the hospital—and therefore I make no finding as to whether the injury plaintiff complained of when he entered the Veterans Administration Hospital was drug related.

3. "Compartment syndrome" is a condition which results from a blow or other injury to a part of the body causing an accumulation of purulence in the muscular compartment. The accumulation puts undue pressure on the compartment until, if not immediately treated, it breaks through the compartment and in so doing destroys internal body structure in the vicinity of the compartment.

■ c. The medical records maintained on the plaintiff were deficient, falling below the standard of care required of a medical facility. Specifically, the records were summary in nature and did not document plaintiff's condition to the degree necessary for the proper monitoring of his condition. For instance, the records did not adequately describe the location or the relative progression of the swelling, nor provide details of any medical examinations performed. Thus the records did not provide the next attending physician with adequate information for him to perform his duties.

■ 7. Standards of care for the medical community are promulgated by the Joint Commission of Hospital Accreditation ("JCAH"). These standards require that a hospital like the VAMC properly monitor a patient's condition and that the hospital keep proper records. Such proper records are defined as the presence of notes written by the attending physician concerning the details of a patient examination. The absence of such detailed notes, as in this case, is a breach of the applicable duty.

8. By the time plaintiff's condition was finally recognized on October 12, it had become an extreme emergency and he was immediately operated on. When the doctors cut open the arm to drain the abscess, they found that the infection was so bad that pus had already eaten holes through the fascia.

9. The operation performed on plaintiff on October 12 by Dr. Benfield was expertly done and the follow-up treatment fully met the standards of the profession.

10. However, plaintiff's condition as it existed on October 12 was so bad that five additional operations were ultimately required to treat his condition. After operating on his arm, the doctors sewed his arm to his stomach for an extended period of time to allow the arm to recuperate. Once the arm was severed from the stomach, reconstructive plastic surgery was required for both, which was accomplished by grafting skin from the leg. Although these operations were completed without negligence, the plaintiff—by unnecessarily having to go through them—suffered permanent injury to his hand which precludes him from engaging in a substantial number of recreational and necessary day-to-day activities, as well as disfigurement to other parts of his body.

11. Specifically, plaintiff suffered permanent scarring of his hand and body and a partial *loss of function* of his hand.

a. Plaintiff is unable to fully extend his elbow and has suffered a permanent loss of strength in his left hand.

b. Plaintiff is not now able to engage in a number of normal physical activities and certain employment opportunities are not available to him. Specifically, plaintiff cannot perform work that requires strength in his hands like bricklaying and word processing, two tasks which he claims are of interest to him and with respect to which he states he has had some training.

c. Plaintiff's ability to enjoy certain recreational and social activities have been diminished.

12. Plaintiff has undergone a great deal of *pain and suffering* as a result of six surgical procedures, a complicated skin graft and a much longer hospital stay and recuperative period.

13. Plaintiff will have to undergo further plastic surgery to reduce the unsightliness of the scars on his arm, stomach and thigh.

14. Plaintiff has not met his burden of showing any loss of past or future earnings. Plaintiff's work record is not good—he has been unable to hold a steady job throughout most of his post military days. Moreover, it appears that plaintiff's drug addiction has severely interfered with his work record.

15. I find that the plaintiff has suffered damages in the amount of $85,000.

*Conclusions*

Plaintiff's action is brought under the Federal Torts Claims Act, 28 U.S.C. § 1346(b), §§ 2671 *et seq.*, which allows the United States to be held liable for torts "in the same manner and to the same extent as a private individual under like circumstanc-

es, but ... not ... for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. In a District of Columbia medical malpractice case, the plaintiff bears the burden of presenting evidence "which establishes the applicable standard of care, demonstrates that this standard has been violated, and develops a causal relationship between the violation and the harm complained of." *Kosberg v. Washington Hospital Center, Inc.*, 394 F.2d 947, 949 (D.C.Cir.1968), *quoted in Haven v. Randolph*, 494 F.2d 1069, 1070 (D.C.Cir. 1974); *Walker v. United States*, 600 F.Supp. 195 (D.D.C.1985); *Snead v. United States*, 595 F.Supp. 658 (D.D.C.1984).

In this case, the standard of care owed to the plaintiff emanated primarily from three sources: *first*, a duty of care exists for doctors, as for defendants generally, which requires that the doctor act as a reasonably prudent person, *Robbins v. Footer*, 553 F.2d 123, 126 (D.C.Cir.1977); *second*, the Joint Commission of Hospital Accreditation (JCAH) requires certain specific standards be met in terms of monitoring and keeping records on patients, Finding 7, *supra;* and *third*, because the admitting physician had indicated on the medical records that compartment syndrome had to be "ruled out," a duty arose on the part of the defendant to be especially vigilant in its monitoring of the plaintiff. Finding 3, *supra.*

█ I conclude that the plaintiff has clearly met his burden of showing that defendant breached these duties owed to him. What happened in this case closely resembles a *res ipsa loquitur* case. *See Burke v. Washington Hospital Center*, 475 F.2d 364, 365 (D.C.Cir.1983) ("The jury could infer negligence without any further showing, under the doctrine of *res ipsa loquitur*, because the event complained of is clearly one which 'ordinarily would not happen in the absence of negligence ...'") (citations omitted). The plaintiff was admitted to the hospital for observation on October 5th with a relatively minor hand infection which was clearly treatable; his care was in the hospital's control from October 5th until October 12th; on the morning of the 12th he had to undergo major

emergency surgery. Instead of plaintiff's treatable condition getting better, it in fact worsened to the extent of becoming extremely critical. Under ordinary circumstances this should not have occurred.

Plaintiff has been able to further establish that during those crucial seven days of observation, the hospital failed at several important tasks. *First*, the doctors failed to monitor the plaintiff with any consistency. Finding 6(a), *supra*. Whether he had compartment syndrome or not, had the plaintiff been monitored for compartment syndrome—as he should have been after the admitting doctor ordered it be "ruled out," Finding 3, *supra*—his worsening condition would have been diagnosed long before it was and the serious permanent injuries plaintiff suffered could have been avoided.

*Second*, those who did monitor the plaintiff's condition did not keep adequate records of what they saw. Hospital records must be complete enough to alert the attending physician on the next hospital shift of a patient's ongoing condition. Finding 7, *supra*. Because no one doctor was assigned to the plaintiff, it was especially important that the records kept be thorough, so that different doctors could adequately understand the progress of his condition and treat him accordingly. That is not what happened in this case: visits to the plaintiff were not adequately recorded in the medical records. This absence of adequate medical records meant that doctors who made subsequent visits to the plaintiff were unable to keep proper track of his progress, and thus were essentially forced to guess in their treatment of him. Finding 6(c), *supra*. The records here simply did not provide the detail required by the standards of care in the medical community. Finding 7, *supra*. The treating physicians were thereby negligent in their monitoring of plaintiff.

*Third* in those instances when visits were made, and notes taken, it appears that the plaintiff's complaints were not adequately addressed. Finding 6(b), *supra*. Thus, the hospital was also negligent in that it did not adequately follow up demon-

strable signs of plaintiff's worsening condition as a prudent person would have.

The plaintiff has presented a series of circumstances which amount to clear negligence in the defendant's treatment of him. Moreover, it is clear that defendant's failure to treat plaintiff in a capable and timely manner was not only a breach of the standard of care but also the proximate cause of the substantial injuries suffered by plaintiff.

Plaintiff is entitled to be compensated for those injuries suffered as a result of defendant's negligence. He has proven a loss of function of his hand, Finding 11(a), *supra*, which has circumscribed his ability to take part in a number of physical activities as well as his ability to accept certain employment opportunities. Finding 11(b), *supra*.[4] The loss of function also inhibits plaintiff's ability to enjoy certain recreational and social activities. Finding 11(c), *supra*. Additionally, plaintiff has encountered a great deal of pain and suffering. Finding 12, *supra*. He will encounter even more pain and suffering—as well as future medical expenses—because he must undergo plastic surgery to correct the unsightly scars the past operations have left him with. Findings 13, *supra*.

I conclude that plaintiff is entitled to an award of $85,000. Finding 15, *supra*. Because of the plaintiff's past history of drug usage and his inability to manage his life, it has been agreed between the parties that any award I make be partially in the form of a life time annuity. The $85,000 award to the plaintiff shall be allocated as follows:

1. $25,000 payable to plaintiff, out of which attorney's fees and expenses can be paid.

2. $60,000 to be used to purchase a life time annuity for plaintiff.

The annuity purchased for the plaintiff shall not be subject to garnishment or attachment for any past or future debts of the plaintiff.

---

**4.** This loss of work opportunity is different than a measurement of "lost profits." Because of the loss of function in his hand, plaintiff will not be able to accept work he is skilled to do, but will either have to retrain for other work, or accept more menial and less demanding employment. This is a loss which is a compensible consequence of defendant's negligence regardless of the details of the plaintiff's past or future employment. Loss profits, on the other hand, flow from missed work itself and missed future employment. This the plaintiff has not been able to prove. Finding 14, *supra*.