Susan **FERRELL**, et al., Appellants,

v.

Kenneth N. **ROSENBAUM**,
M.D., et al., Appellees.

No. 94–CV–1179.

District of Columbia Court of Appeals.

Argued Nov. 21, 1995.
Decided April 3, 1997.

Norman G. Schneider and Edward Lee Rogers, Washington, DC, for appellants.

Mary Lynn Reed, Vienna, VA, for appellees.

Before TERRY and RUIZ, Associate Judges, and NEWMAN, Senior Judge.

RUIZ, Associate Judge.

Susan Ferrell and her daughter, Alexis Ferrell, brought a medical malpractice action against Kenneth N. Rosenbaum, M.D., and Children's National Medical Center ("CNMC") based upon their allegedly negligent failure to diagnose Alexis Ferrell as suffering from Fanconi anemia, a potentially fatal genetic blood disorder. The trial court awarded summary judgment to Dr. Rosenbaum and CNMC and denied the Ferrells' motion for reconsideration.

Alexis Ferrell is a young girl [1] who suffers from Fanconi anemia, a progressive aplastic anemia that prevents the production of red and white blood cells and platelets. The physical signs of Fanconi anemia include thumb and kidney abnormalities, small stature and microcephaly. Without a bone marrow transplant, the odds of survival into adulthood are minimal.

Alexis was born on March 27, 1985, at the George Washington University Medical Center in Washington D.C. ("GWUMC"). Shortly after delivery, Alexis was noted to have hypoplastic thumbs [2] and no external auditory canals. Consequently, Susan Ferrell and her husband, Barron Fento Ferrell, were referred to Dr. Rosenbaum, who was Director of Clinical Genetics at CNMC. The morning after Alexis was born, Dr. Rosenbaum examined Alexis at GWUMC and found that in addition to the hypoplastic thumbs and lack of external auditory canals, she also had a slightly anteriorly placed anus and small ears. A renal sonogram also indicated that Alexis was missing a kidney. At this time, Dr. Rosenbaum indicated to Mrs. Ferrell that he would have various diagnostic

---

1. Alexis was nine years old in 1994.

2. Her thumbs were smaller than normal and in an immature state.

tests, including a chromosome test, performed on Alexis.

Two days later, on March 30, 1985, an analysis of Alexis's blood performed at GWUMC showed that Alexis had abnormally elevated mean corpuscular volume ("MCV") and mean corpuscular hemoglobin ("MCH") levels and an abnormally low red blood cell ("RBC") count. However, Dr. Rosenbaum did not review these results. After several follow-up visits, Dr. Rosenbaum misdiagnosed Alexis with having a malformation syndrome referred to as the VATER association. Alexis first went to CNMC approximately two weeks after birth, at which time her deformed left thumb was surgically removed. Thereafter, Alexis was continuously seen by Dr. Rosenbaum at CNMC. When Alexis was approximately thirteen months old, Dr. Rosenbaum noted that Alexis was having trouble gaining weight, that her head was abnormally small, and that he "did not think that these problems could be attributed solely to her malformation syndrome."

Hematological data taken from the tests done at GWUMC three days after Alexis's birth on March 30, 1985, and from further tests conducted at CNMC on October 27, 1985, and April 26, 1986, consistently showed that Alexis had abnormally high MCV and MCH levels and an abnormally low RBC. These abnormal results, which were all indicative of Fanconi anemia, were marked on the laboratory reports with asterisks to alert the physicians of their abnormality. However, neither Dr. Rosenbaum, nor anyone else at CNMC, reviewed the results of the blood tests. Further, Dr. Rosenbaum did not pursue his belief that Alexis's problems could not be attributed solely to the malformation syndrome he believed to be affecting her. Instead, when Dr. Rosenbaum last saw Alexis on April 28, 1987, he noted that Alexis's malformation syndrome was following the expected course, and his only recommendation was to see her in one year for a follow-up visit.

Susan Ferrell and her husband separated in June 1987. Mr. Ferrell moved to Califor-

nia two years later and subsequently has contacted Mrs. Ferrell only twice, by telephone, in October 1989 and in Spring 1991. His whereabouts are currently unknown. During their last conversation, Mr. Ferrell told Mrs. Ferrell he was homeless.

Alexis was admitted to Arlington Hospital in April of 1990 with pneumonia. When she was released, Alexis was referred to a hematologist, Dr. Joseph E. Gootenberg, who informed Mrs. Ferrell that because of her physical deformities and blood count, he strongly suspected that Alexis suffered from Fanconi anemia and that he would need to send blood and bone marrow samples to New York for testing in order to confirm his diagnosis. On October 30, 1990, Dr. Gootenberg informed Mrs. Ferrell that his suspicion was correct: Alexis had tested positive for Fanconi anemia.

The basis for Mrs. Ferrell's claim of injury is that had Alexis been diagnosed properly while under Dr. Rosenbaum's care, the Ferrells would have been informed that a matched bone marrow transplant from a sibling donor was the best treatment for their daughter's condition. Because they were then living together and loved Alexis, they would have taken the opportunity to have another child who could have donated a matched bone marrow for transplantation. However, due to Dr. Rosenbaum's and CNMC's negligence, Alexis was misdiagnosed until October 1990 and, consequently, the Ferrells were not informed of the necessary treatment during the time that Mr. Ferrell was part of the family. Since Mr. Ferrell cannot now be found, Alexis's only chance for a matched sibling donor has been foreclosed. Consequently, as a result of Dr. Rosenbaum's and CNMC's negligence, Alexis's chance to obtain the matched bone marrow transplant donor she needs for survival has been significantly reduced.

*The Trial Court Proceedings*

Mrs. Ferrell filed a statement pursuant to Superior Court Civil Rule 26(b)(4) on March 17, 1994, listing among the experts Dr. Nasrollah Thomas Shahidi,[3] who would testify as

---

**3.** Dr. Shahidi is a Professor of Pediatrics at the University of Wisconsin Center of Health Ser- vices, a Medical Advisor to the Fanconi Anemia

to the violation of the standard of care by Dr. Rosenbaum and CNMC. The statement also listed Dr. Alfred P. Gillio,[4] who would testify that Alexis suffers from Fanconi anemia. The Rule 26(b)(4) statement indicated that Mrs. Ferrell might supplement her list of expert witnesses at a later date.[5]

During his deposition on April 26, 1994, Dr. Shahidi expressed his opinion that Alexis could have been properly diagnosed shortly after birth and that it would be a violation of the standard of care not to follow up or repeat the results of Alexis's abnormal blood tests. Dr. Rosenbaum was deposed on May 12, 1994. From Dr. Rosenbaum's deposition Mrs. Ferrell discovered that, in addition to the blood work done at GWUMC three days after Alexis was born, more analysis had been conducted at CNMC some seven and fourteen months later which indicated that Alexis continued to have abnormally high MCV and MCH levels and abnormally low RBC. Dr. Rosenbaum acknowledged in his deposition that he had not reviewed the foregoing blood data and that he did not know if any one else at CNMC had reviewed the results. When Dr. Gillio was informed about Dr. Rosenbaum's deposition testimony, Dr. Gillio indicated that he was prepared to testify that Dr. Rosenbaum's failure to review the blood test results was negligent and resulted in Alexis's loss of an opportunity for survival.

Mrs. Ferrell's counsel promptly gave appellees' counsel oral and written notification that the scope of Dr. Gillio's testimony would be broader than had been indicated on the initial Rule 26(b)(4) statement and filed a "Supplemental Statement Pursuant to Rule 26(b)(4)" on June 3, 1994, the day discovery was closed under the pretrial order.[6] The supplemental statement explained that in light of the belated discovery that Dr. Rosenbaum had not reviewed the blood test data, Dr. Gillio, who initially had been identified as an expert witness for appellants on Alexis's diagnosis and prognosis in the initial statement, was also prepared to testify as to Dr. Rosenbaum's violation of the standard of care and its adverse effect on Alexis's treatment. Appellees filed a motion to strike the supplemental statement on June 24, 1994; Mrs. Ferrell filed an opposition to appellees' motion on July 1, 1994. The trial court did not rule on the motion to strike.

Appellees filed a motion for summary judgment stating that there was no genuine issue as to any material fact and that they were entitled to judgment as a matter of law. Mrs. Ferrell responded by filing a motion for partial summary judgment and opposing appellees' motion for summary judgment. Mrs. Ferrell's motion for partial summary judgment was based on appellees' violation of their specific duty to at least review Alexis's blood data. In support of her opposition, Mrs. Ferrell argued that the record contained "ample evidence to support a finding by a jury that [appellees] violated the applicable standard of care and that the negligence effectively deprived Alexis of her only chance of survival."

The Superior Court denied Mrs. Ferrell's motion for partial summary judgment and granted summary judgment to Dr. Rosenbaum and CNMC. First, the trial court found that there were no disputed issues of materi-

Research Fund, and the author of numerous articles on Fanconi anemia.

4. Dr. Gillio is a Pediatric Hematologist in the Bone Marrow Transplantation Service at Memorial Sloan Kettering Cancer Center.

5. Appellees similarly reserved the right to supplement their statement.

6. Mrs. Ferrell's counsel sent two letters to appellees' counsel indicating that Dr. Gillio was prepared to testify that Dr. Rosenbaum violated the standard of care. The first letter, dated May 17, 1994, described Dr. Gillio's proposed testimony in light of the fact that Dr. Rosenbaum had revealed, during his deposition, that he failed to review and evaluate Alexis's blood test data. The letter requested that appellees' counsel inform Mrs. Ferrell's counsel if appellees would prefer that Mrs. Ferrell file a formal amended statement and invited counsel to make arrangements to depose Dr. Gillio. Appellees' counsel did not respond to this letter. A second letter addressing the same points was sent by Mrs. Ferrell's counsel on May 27, 1994. On June 2, 1994, appellees' counsel responded that appellees did not recognize the May 27, 1994 letter as a formal supplement to the Rule 26(b)(4) statement. The next day, Mrs. Ferrell filed a supplemental Rule 26(b)(4) statement indicating the broader scope of Dr. Gillio's proffered testimony and the reason therefor.

al fact. Second, the trial court considered that Mrs. Ferrell had not demonstrated that Dr. Rosenbaum and CNMC departed from the applicable standard of care, and that even if she could so demonstrate, "the undisputed evidence does not suggest that an earlier diagnosis would have provided [Alexis] with a sufficiently substantial chance of survival."

## I.

We review a grant of summary judgment *de novo* to ensure that there is no genuine issue of material fact and that the prevailing parties are entitled to judgment as a matter of law. *Colbert v. Georgetown Univ.*, 641 A.2d 469, 472 (D.C.1994) (en banc). In ascertaining whether any material facts are in dispute, we view the entire record and we do so in the light most favorable to the party opposing the motion. *Id.* To defeat a motion for summary judgment in a medical malpractice action, the non-movant must establish a prima facie case of medical malpractice, consisting of 1) establishing the applicable standard of care, 2) showing that the applicable standard has been violated, and 3) proving a causal relationship between the violation and the alleged harm. *Miller v. Greater Southeast Community Hosp.*, 508 A.2d 927, 930 (D.C.1986) (citing *Kosberg v. Washington Hosp. Ctr., Inc.*, 129 U.S.App. D.C. 322, 324, 394 F.2d 947, 949 (1968)). Applying the summary judgment standard to the record before us, we conclude that there was a genuine dispute over material facts. Further, the record contains sufficient evidence from which a jury could find that Dr. Rosenbaum and CNMC violated the standard of care and that this negligence deprived Alexis of a substantial chance for survival. Therefore, appellees are not entitled to judgment as a matter of law. We reverse and remand the case to the trial court.

## II.

On appeal, Mrs. Ferrell argues that the trial court erred 1) by failing to consider Dr. Alfred Gillio's proffered testimony as to Dr. Rosenbaum's and CNMC's violation of the standard of care in the supplemental Rule 26(b)(4) statement; 2) by applying the wrong standard for the admissibility of expert medical opinion when considering Dr. Shahidi's testimony; 3) by failing to consider Dr. Rosenbaum's testimony indicating that he had not reviewed the blood data; and 4) by misconstruing the injury resulting from the claimed negligence to be the delay in performing a bone marrow transplant on Alexis, rather than the loss of her best opportunity to have a transplant, whenever medically indicated, from a potential sibling donor.[7]

### A.

■ Mrs. Ferrell's principal claim of error is that in awarding summary judgment the trial court failed to consider Dr. Gillio's proffered additional testimony which had been adequately set forth in the supplemental Rule 26(b)(4) statement. Because this supplemental statement indicated that Dr. Gillio would testify that Dr. Rosenbaum and CNMC negligently failed to diagnose Alexis, and that such failure caused her to lose a substantial chance for survival, ignoring it was harmful error. The trial court erred when it granted summary judgment based on Mrs. Ferrell's failure to proffer evidence of a breach of standard of care and its proximate cause of the injury.

The court's order granting summary judgment does not address or even mention Dr. Gillio's proffered testimony given in the supplemental Rule 26(b)(4) statement. This proffered testimony was pointed out to the court in both Mrs. Ferrell's motion for partial summary judgment and in her opposition to appellees' motion for summary judgment. Appellees argue that the trial court need not have considered Mrs. Ferrell's supplemental Rule 26(b)(4) statement because the statement was not properly before the court.

■ We usually defer to the exercise of trial court discretion under Rules 16 and 26. *Gibson v. United States*, 566 A.2d 473, 479 (D.C.1989); *see Corley v. BP Oil Corp.*, 402

7. In light of our disposition reversing summary judgment, we do not address Mrs. Ferrell's fifth ground for reversal, that the trial court erred in refusing to consider the affidavits of Dr. Gillio and Dr. Shahidi attached to her motion to reconsider the grant of summary judgment.

A.2d 1258, 1262 (D.C.1979). It is unclear from the trial court's order granting summary judgment to appellees, however, whether the trial court impliedly granted appellees' motion to strike the supplemental statement or, although not striking the statement, failed to consider the testimony proffered in the supplemental statement in making its decision.[8] All we know from the record is that the reference to Dr. Gillio's proffered testimony in the supplemental statement is not mentioned in the trial court's order granting summary judgment. On this record, we cannot conclude, as appellees urge, that the trial court intended to strike the supplemental statement. Superior Court Civil Rule 26 requires parties to supplement their discovery responses with regard to the identity of expert witnesses, the subject matter and the substance of their testimony.[9] Mrs. Ferrell did so within the time provided for discovery.

In determining whether the supplemental statement was part of the record upon which the summary judgment motion should have been considered, we take into account the reason for the supplement, the importance of the proffered testimony and any prejudice to the opposing party. *See Daniels v. Beeks,* 532 A.2d 125, 128 (D.C. 1987). Considering that this case turned upon expert testimony regarding violation of the standard of care which Dr. Gillio's proffered testimony provided,[10] that the need for supplementation was caused by new information from Dr. Rosenbaum and that there is no credible prejudice to appellees,[11] we do not assume that the trial court intended to exclude Dr. Gillio's important proffered testimony. We have held that it is an abuse of discretion for a trial court to deny a party's motion to amend a pretrial order seeking to add new expert testimony, particularly where there is no prejudice to the other party. *Id.*[12] We conclude that the supplemental statement should have been considered by the trial court in its consideration of appellees' summary judgment motion. Therefore, in our *de novo* review of the evidence presented, we consider Dr. Gillio's proffered testimony in evaluating whether summary judgment was appropriate.

The supplemental statement indicated that Dr. Gillio's proffered testimony could show that Dr. Rosenbaum breached his duty of care towards Alexis. Dr. Gillio would testify that Dr. Rosenbaum and CNMC should have examined and evaluated the data and that such review would have led to a diagnosis of Fanconi anemia. This proper diagnosis would then have allowed the Ferrells to produce a matched donor sibling who would now be life-saving.

We conclude that Dr. Gillio's proffered expert testimony was sufficient to create a genuine question of fact regarding Dr.

---

8. Although the trial court's order granting summary judgment states that the trial court considered "the entire record herein," it fails to mention the proffered testimony of Dr. Gillio.

9. Super.Ct.Civ.R. 26(f)(1)(B) provides in part:

   (f) Supplementation of responses. A party who responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:
   (1) A party is under a duty seasonably to supplement the response with respect to any question directly addressed to ... (B) the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, and the substance of the person's testimony.

10. As discussed in the next section, the trial court appears to have concluded that the Ferrells' other expert, Dr. Shahidi, had not sufficiently expressed an opinion that Dr. Rosen-

baum, a geneticist, had breached the applicable standard of care. In view of the trial court's conclusion, Dr. Gillio's testimony was all the more important to the Ferrells' case.

11. *Daniels v. Beeks, supra,* allows amendments as long as there is "ample time to accommodate any request ... to obtain discovery of any additional witnesses identified in the ... supplemental pretrial statement." *Id.* Appellees had a chance to depose Dr. Gillio, but chose not to do so.

12. Appellees' argument that pursuant to Super.Ct.Civ.R. 16(g), Mrs. Ferrell required leave of court for good cause to file her supplemental statement, is without merit considering the affirmative duty to supplement information imposed on the parties pursuant to Super.Ct.Civ.R. 26(f)(1)(B). In any event, good cause would have been shown since the reason Dr. Gillio broadened the scope of his testimony was as a result of discovery conducted after the initial Rule 26(b)(4) statement was filed.

Rosenbaum's violation of the standard of care and, for the reasons explained *infra*, its proximate cause to the Ferrells' subsequent inability to produce a sibling donor for Alexis.[13] These material facts must be resolved against the moving party in deciding a motion for summary judgment. *Colbert, supra*, 641 A.2d at 472. Therefore, summary judgment should not have been granted.

## B.

■ Mrs. Ferrell's second ground for reversal is that the trial court applied the wrong standard for the admission of expert medical testimony when it considered Dr. Shahidi's testimony regarding Dr. Rosenbaum's violation of the standard of care. Dr. Shahidi's deposition testimony set out the applicable standard of care for physicians and stated that this standard was violated when Dr. Rosenbaum failed to review the blood results. Dr. Shahidi opined that had the standard of care not been violated, Alexis would have been diagnosed with Fanconi anemia "shortly after birth." The trial court concluded that Dr. Shahidi's testimony did not establish a violation of the applicable

standard of care because Dr. Shahidi was unwilling to testify concerning the standard of care for a geneticist, Dr. Rosenbaum's medical expertise.

Our review of the record indicates that Dr. Shahidi clearly stated in his deposition that failure to review and follow up on abnormal hematological reports violated the standard of care and prevented early diagnosis of Fanconi anemia.[14] The issue, therefore, is whether Dr. Shahidi was qualified to render that opinion.

■ As we recognized in *Ornoff v. Kuhn & Kogan, Chartered*, qualifying "'a particular witness to testify as an expert is largely within the domain of the trial judge.'" 549 A.2d 728, 731 (D.C.1988) (per curiam) (quoting *Jenkins v. United States*, 113 U.S.App. D.C. 300, 308 n. 19, 307 F.2d 637, 645 n. 19 (D.C.Cir.1962) (en banc)). As *Ornoff* explains, it is not necessary that an expert witness testify or be knowledgeable about the standard of care applicable to a particular medical specialty. Instead, the issue is whether the expert is qualified *concerning*

---

13. Dr. Gillio's testimony was not the only proffered evidence relevant to the issue of malpractice. As discussed in section B, *infra*, Dr. Shahidi's testimony also was sufficient for Mrs. Ferrell to overcome the summary judgment motion.

14. [On examination by appellees' counsel]:
    Q: Why don't you begin by generally listing for me what those opinions are, and then we will go back and discuss them in further detail.
    A: Well I believe that the clinical presentation of this patient at birth should have included Fanconi's [sic] anemia, because of various congenital anomalies consistent with this disorder, particularly the thumb disorders. And then, in addition, the lack of explanation for the growth retardation, which is very common in patients with Fanconi anemia. This patient had adequate caloric intake, had normal levels of growth hormone, but continued to be physically retarded.
    In addition, if you look at the laboratory values obtained three days, I believe, after birth, you will find that there are some abnormalities.
    Q: Are there any other opinions you hold regarding this case?
    A: You mean regarding the diagnosis?
    Q: Any opinions that you have formed, regarding this case, which you intend to express at trial?

    A: Well, just—my opinion is that this patient could have been diagnosed earlier; based on the physical findings and hematological findings, and also by chromosomal analysis.
    Q: When you say that the "the patient could have been diagnosed earlier," what is your opinion in terms of how early the patient could have been diagnosed?
    A: The patient could have been diagnosed shortly after birth.
    [On examination by the Ferrells' counsel:]
    Q: Dr. Shahidi, is it true that any doctor reviewing the physical abnormalities that Alexis presented with, and the blood work, should have followed up or gone down the path of differential diagnosis toward Fanconi?
    A: Well, I think the clinical laboratories—they have a system to alert the physician of various abnormalities, and determine the cause of it or ask for a repeat blood count, because sometimes there may be some laboratory errors.
    Q: And a doctor that doesn't follow up on those things and doesn't repeat the blood count, would you say that falls below the standard of care for a physician in reviewing what was before him or her?
    A: Oh, yes.

the particular procedure about which he is testifying. *Id.* The trial court discredited Dr. Shahidi's expert testimony because he was not prepared to specifically state that Dr. Rosenbaum violated the standard of care of a geneticist. This was error. The problem here, as in *Ornoff*, is that the trial court focused too much on the specialty and not enough on the breach alleged. *Id.* That Dr. Shahidi was not willing to testify that Dr. Rosenbaum violated the standard of care for a geneticist, did not preclude Dr. Shahidi from expressing his opinion that Dr. Rosenbaum violated the standard of care applicable to any physician who is presented with Alexis's condition by failing to review and follow up on hematological abnormalities, and as a result, misdiagnoses the patient. Common sense dictates that Dr. Rosenbaum can be included in the category encompassing "any doctor" about which Dr. Shahidi was questioned. Dr. Rosenbaum's qualifications as a geneticist may have held him to another, higher standard of care, but it did not release him from the basic standard of care required of *any doctor* treating Alexis to review and follow up on her abnormal blood test data. Therefore, we conclude that the trial court abused its discretion by not crediting Dr. Shahidi's proffered testimony concerning breach of the applicable standard of care. Consideration of Dr. Shahidi's testimony leads us to conclude that the Ferrells made a prima facie case that Dr. Rosenbaum violated the standard of care, delaying a correct diagnosis of Alexis's condition.

### C.

■ Mrs. Ferrell also argues that the trial court erred when it failed to take into account Dr. Rosenbaum's deposition testimony indicating that he had not reviewed the data indicating abnormalities in Alexis's blood count.[15] Appellees argue that Dr. Rosenbaum never "admitted" to having violated the standard of care. Although Dr. Rosenbaum did not make an admission as to the ultimate issue of breach of the standard of care, he

testified that the fact that his notes did not indicate that he had seen the blood work probably meant that he had not reviewed the blood data. This testimony was enough to raise a question of material fact as to breach of the standard of care. Dr. Shahidi's testimony and Dr. Gillio's proffered testimony that failure to review and follow up on the information contained in Alexis's medical records violated the standard of care, made Dr. Rosenbaum's testimony that he did not do so highly relevant. *See Thomas v. United States,* 660 F.Supp. 216, 219 (D.D.C.1987). Once the blood tests were performed and they indicated abnormalities, appellees were under a specific duty to take further diagnostic action. *Id.* Since Dr. Rosenbaum and CNMC did not take such action, they would have breached the duty of care owed to Alexis. Therefore, it was error for the court to conclude that there was no disputed issue of material fact on the issue of breach of the standard of care. Dr. Rosenbaum's deposition testimony, in the context of the expert testimony concerning the applicable standard of care, was sufficient to defeat summary judgment.

### D.

■ Mrs. Ferrell's last contention is that the trial court's conclusion that "there is no prima facie showing of proximate cause" was erroneously based on a misapprehension of Alexis's alleged injury to be that the missed diagnosis of Fanconi anemia delayed a bone marrow transplant. Instead, the claimed injury is the loss of Alexis's best opportunity to have a transplant by a potential sibling donor.

In the order granting summary judgment the trial court concluded:

Moreover, the undisputed evidence does not suggest that an earlier diagnosis would have provided [Alexis] with a sufficiently substantial chance of survival. In addition to the testimony of Dr. Shahidi, in that

---

**15.** Dr. Rosenbaum testified as follows in his deposition:

Q. I am not asking—I am trying to find out at no time during her treatment or any time that she was at Children's Hospital did you

see her blood work ups relating to Alexis Ferrell that were performed by Children's Hospital?

A: If it is not indicated in my notes, then I expect I didn't see it.

**650**

regard, the absence of evidence of proximate cause is further demonstrated by Dr. Alter, the treating pediatric hematologist, who testified that in December 1990, after the diagnosis on October 30, 1990, that [s]he could not have recommended a bone marrow transplant, because the child was stable, and the risks of transplant were high. Thus, there is no prima facie showing of proximate cause. . . .

Mrs. Ferrell contends that the court's reliance on Dr. Alter's testimony indicates that the trial court misunderstood the nature of the harm suffered by Alexis and that Dr. Alter's testimony was irrelevant to the harm alleged to have been caused by the negligence of Dr. Rosenbaum and CNMC.

In her filings in the trial court, as in this court, Mrs. Ferrell has consistently argued that appellees' misdiagnosis harmed Alexis by depriving her parents from being informed, prior to their separation and estrangement, that a sibling could serve as the best bone marrow donor for Alexis, thereby precluding Alexis from any chance of ever obtaining a matched sibling bone marrow donor. Although Dr. Alter's testimony tends to show that the transplant was not appropriate at the time Alexis was diagnosed as suffering from Fanconi anemia, it does not defeat Mrs. Ferrell's showing of proximate cause. Even if, as Dr. Alter testified, the transplant should not have occurred at the time an accurate diagnosis was made, Dr. Alter did not rule out a transplant at another time. Therefore, the *possibility* remained that, had the Ferrells known about the Fanconi anemia and its optimum treatment with a matched donor transplant, they would have taken steps to conceive a sibling or siblings who could have provided a compatible bone marrow donor whenever the transplant was appropriate. Because the Ferrells did not know of Alexis's anemia and its best treatment, however, they did not take any of these steps at the time. That lost opportunity has meant that the possibility of a matched donor was permanently foreclosed due to Mr. Ferrell's subsequent estrangement from his family. Therefore, appellees' negligence caused Alexis's loss of the opportunity for the best treatment, a transplant from a compatible sibling donor.

Even assuming that the trial court correctly apprehended the gravamen of Alexis's claimed injury, we conduct an "independent review of the record to determine whether there is a genuine issue of material fact to be tried" on the issue of proximate cause. *Claytor v. Owens–Corning Fiberglas Corp.*, 662 A.2d 1374, 1381 (D.C.1995). We conclude that the trial court erred when it determined that Mrs. Ferrell had not made a prima facie showing of proximate cause on the ground that "the undisputed evidence does not suggest that an earlier diagnosis would have provided [Alexis] with a sufficiently substantial chance of survival."

▬ Proximate cause is divided into cause in fact and policy considerations that limit the liability of persons who have, in fact, caused the injury " 'where the chain of events appears highly extraordinary in retrospect.' " *Lacy v. District of Columbia*, 424 A.2d 317, 320–21 (D.C.1980) (quoting Reporter's Notes to § 433, RESTATEMENT (SECOND) OF TORTS, 3 app., at 129 (1966)). Appellees argue that the alleged negligence was not the cause in fact of Alexis's injury because Mrs. Ferrell was unable to demonstrate that she would have certainly conceived a compatible donor sibling.

▬ In determining whether there has been cause in fact, the plaintiff is not required to prove causation to a certainty. The bare possibility that the Ferrells could have had another child, or children, that could have been a suitable bone marrow donor for Alexis, however, is not sufficient to defeat a motion for summary judgment for failure to show proximate causation. Something more is needed. The proper test is whether the plaintiff can prove, by a preponderance of the evidence, that the asserted negligence was a "substantial factor" in causing the injury. *Id.* at 318–319; *Daniels v. Hadley Mem'l Hosp.*, 185 U.S.App. D.C. 84, 92, 566 F.2d 749, 757 (1977) *quoted with approval in Lacy, supra,* 424 A.2d at 320; *Graham v. Roberts,* 142 U.S.App. D.C. 305, 441 F.2d 995 (1970).

▬ In *Daniels,* the court applied the substantial factor test in a medical malprac-

tice case where the plaintiff sought damages for a "lost chance of survival." The substantial factor test "is the appropriate test for causation in cases, such at [sic] this, where the harm appears to have been brought about by two or more concurrent causes." 185 U.S.App. D.C. at 92, 566 F.2d at 757. The court, applying District of Columbia law, rejected the claim that a plaintiff must conclusively show that the harm would not still have occurred absent the malpractice.

As the court noted:

> [I]t does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. *If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable.* Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass.

*Id.* at 92, 566 F.2d at 757 (quoting *Hicks v. United States,* 368 F.2d 626 (4th Cir.1966)). (Emphasis added.)

In determining whether the negligence was a substantial factor in causing the harm, the *Daniels* court focused on two questions: a) what chance the plaintiff had to survive if properly diagnosed and treated and b) the extent to which the defendants' negligence reduced this chance. *Id.*

We conclude that *Daniels'* two-pronged analysis correctly applies District of Columbia law on proximate causation in a case such as this involving negligent treatment of a potentially fatal condition. Applying the analysis to this case, we determine that Mrs. Ferrell made a showing, sufficient for summary judgment purposes, that Dr. Rosenbaum's and CNMC's negligence was a substantial factor in causing Alexis's injury. The first prong of the analysis involves Alexis's chances to survive had she been properly diagnosed and treated. Proper treatment in this case, meant a bone marrow transplant from a suitable matched donor.[16] The record clearly supports a finding that had Dr. Rosenbaum or any other qualified person at CNMC reviewed the blood data, a diagnosis of Fanconi anemia would have resulted in 1985, and the Ferrells would have at least been given the opportunity to conceive a child or children who would be compatible donors for Alexis. Mrs. Ferrell testified that she would have done anything possible to help Alexis, including having another child or children; the record supports an inference that Mr. Ferrell would have been supportive of such efforts.[17] According to the expert

16. According to Dr. Gillio's proffered expert testimony in the supplemental Rule 26(b)(4) statement, Alexis's prognosis was "not promising in the absence of [a bone marrow] transplant."

The success of a bone marrow transplant apparently depends on how close a match exists between the donor and the recipient. As Dr. Gillio's affidavit in support of Mrs. Ferrell's motion for reconsideration further explains, "[r]ecent reports indicate that 70 to 90 percent of Fanconi anemia patients can be cured of their hematological disease if transplanted with a matched sibling at an early age."

Additionally, Dr. Shahidi's affidavit in support of Mrs. Ferrell's motion for reconsideration states as follows:

4. Usually, the only truly effective long-term beneficial treatment for a Fanconi anemia patient is a transplant, either by bone marrow or cord blood. Without such a transplant, most Fanconi anemia patients die prematurely from their illness or from its complications....

5. Alexis'[s] only substantial chance of a successful transplant would be from a sibling donor.

Although the affidavits were not before the trial court when it ruled on the motion for summary judgment, they are consistent with the proffered testimony that was available to the trial court at that time, and presumably show how Drs. Gillio and Shahidi would have testified if the case had been allowed to proceed to trial.

17. Appellees contend that the record does not support a finding that Mr. Ferrell would have agreed to attempt to conceive another child even if the Ferrells had known that Alexis had Fanconi anemia when Mr. Ferrell was still part of the family. This argument was not made below; therefore it is not before us for consideration. Even were it properly before us, it is without merit. Alexis was born in March 1985. Mrs. Ferrell testified that Mr. Ferrell was very attentive to Alexis and that Mr. Ferrell would spend a lot of time with his daughter. The Ferrells were separated sometime in 1987, and Mr. Ferrell left for California in September 1989. Therefore, Mr. Ferrell was available for four years after Alexis was born. Mrs. Ferrell testified that during that time Mr. Ferrell wanted a reconciliation, but that she did not.

In her response to appellees' Interrogatory No. 14, Mrs. Ferrell stated that had she known that Alexis had Fanconi anemia she

testimony, the chances were significant that the Ferrells, had they conceived a child, would have yielded a suitable donor for Alexis.[18] Thus, the evidence showed that had Alexis been properly diagnosed when Mr. Ferrell was in her life, and had Alexis received a transplant from a compatible sibling donor Alexis would have had "an appreciable chance of saving [her] life." *Id.* at 93, 566 F.2d at 758 (concluding that there was an "appreciable chance" that patient's life would have been saved, after bench trial including testimony that 75–85% of patients survived if given proper treatment).

The second prong, whether the defendants interfered with the plaintiff's chance to avoid the harm is easily met in this case. It is plain from the record that Dr. Rosenbaum's and CNMC's alleged negligence directly interfered with the possibility of Alexis having a transplant from a matched sibling donor. Whatever may be said about the speculative nature of the Ferrells having had a child who could donate bone marrow to Alexis, it is beyond doubt that the alleged negligence eliminated *any* chance that the Ferrells would even consider and implement that course of action. Mrs. Ferrell therefore sufficiently demonstrated that the claimed negligence was a substantial factor in the loss of Alexis's best chance for survival. The trial court's conclusion that Mrs. Ferrell did not

make a prima facie showing of proximate cause was erroneous.

In sum, we conclude that, considering Dr. Gillio's proffered testimony and Dr. Rosenbaum's and Dr. Shahidi's depositions, there was a genuine dispute as to whether Dr. Rosenbaum and CNMC breached the applicable standard of care. We conclude also that the evidence of record was sufficient, for summary judgment purposes, to show that if the jury were to find a breach of the applicable standard of care, that breach was a proximate cause of Alexis's injury.

*Reversed and remanded.*

TERRY, Associate Judge, dissenting:

In this medical malpractice case, the plaintiff mother claims that the doctor and the hospital failed to diagnose her child's illness as Fanconi anemia, a very rare but potentially fatal blood disorder. The complaint alleged that if the right diagnosis had been made early enough, the parents could have conceived another child who might have served as a bone marrow donor for his or her older sister. Because the parents have now separated, that is no longer possible, and thus the mother has filed this suit.

Although there is evidence from which a jury could find that the doctor breached the standard of care, I think the trial judge

would have immediately taken all appropriate steps necessary to assure, to the maximum extent possible, the availability of a bone marrow transplant (BMT) for Alexis when needed, including efforts to become pregnant immediately and have as many children as necessary and possible, in light of her maternal age, to obtain a matching sibling donor.

While appellees could argue to a jury that Mr. Ferrell was unlikely to have agreed to conceive another child or children, the record at this point would support a jury finding that Mr. Ferrell would have helped to save his daughter's life.

Our dissenting colleague states, pages 23–24, *post,* that the fact that "Mr. Ferrell might have been willing to reconcile with his estranged wife prior to June 1987 would not reasonably permit a trier of fact to infer that he might have been interested in doing so after October 1990." This conclusion misses the point of Mrs. Ferrell's argument because it assumes the alleged negligence. Had Dr. Rosenbaum adhered to the standard of care, Alexis would have been properly diagnosed in 1985, not in 1990, two years before her parents separated and four years before Mr.

Ferrell left for California. The dissent's conclusion is also flawed because it assumes that a reconciliation would have been required to avert the injury suffered by Alexis as a result of the negligence. In fact, only Mr. Ferrell's willingness to *sire* another child or children is at issue. This would require a donation of sperm, and not necessarily reconciliation with the mother.

18. The issue that appellees most urgently contest is the chance that the Ferrells would have conceived a child and that such sibling would have been a suitable bone marrow donor.

Dr. Shahidi testified that there was an approximately twenty-five percent chance that any sibling conceived by the Ferrells would be a perfect match for a bone marrow transplant. There is also a twenty-five percent chance that a sibling would have Fanconi anemia, disqualifying that child as a donor. Therefore, there was an 18.75% chance that any one sibling would be a compatible donor. Therefore, Mrs. Ferrell argues, the more children she could have had, the better Alexis's chances would have been to have had a perfect donor.

correctly granted summary judgment for the doctor and the hospital because the mother cannot possibly establish proximate cause. The mother asserts in her brief that she and Mr. Ferrell would have "taken action to produce a matched sibling donor for Alexis' transplant," but there is no evidentiary support for that assertion, and hence no factual predicate on which to base the testimony of any expert that Alexis was deprived of a substantial chance of survival. There is, of course, no deposition or other testimony from Mr. Ferrell that he would have agreed to father another child with Mrs. Ferrell. As for the mother, she testified in deposition that she and her husband had separated in June 1987 without any expectation of reconciling, and that she had not seen him since September 1989, when he left for California and never returned. She also stated that she had no interest in a reconciliation in the time between their separation in 1987 and the father's departure for California in 1989. There is nothing in the record to suggest that either parent made any attempt, or had any intention, to reconcile once the diagnosis of Fanconi anemia was made in October 1990 in order to conceive another child. I simply cannot agree with my colleagues that "the record supports an inference that Mr. Ferrell would have been supportive of such efforts." *Ante* at 651. The fact that Mr. Ferrell might have been willing to reconcile with his estranged wife prior to June 1987 could not reasonably permit a trier of fact to infer that he might have been interested in doing so after October 1990.

The father is the irreplaceable missing link in the chain of causation. Without a clear showing that he would have consented to sire another child in the hope of producing a possible bone marrow donor, I do not see how the mother can possibly establish that the doctor's breach of the standard of care proximately caused her child's injury. As I read the record, such a showing has not been made. Since my colleagues take a different view, I respectfully dissent.