*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 11-CV-1540

RONALD G. PERKINS, APPELLANT,

v.

DARCY J. HANSEN, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAM-6416-08)

(Hon. Natalia M. Combs Greene, Trial Judge)


(Argued  November 6, 2012                    Decided November 7, 2013)

*Barry J. Nace*, with whom *Christopher T. Nace* was on the brief, for appellant.

*James P. Gleason, Jr.* and *D. Lee Rutland*, with whom *Alissa A. Watts* was on the brief, for appellees.

Before OBERLY and MCLEESE, *Associate Judges*, and PRYOR, *Senior Judge*.


OBERLY, *Associate Judge*:  On June 6, 2007, Margie Perkins died at Georgetown University Hospital from severe liver failure.  Appellant Ronald Perkins, Mrs. Perkins's husband, brought a medical malpractice action, individually and as administrator and personal representative of his wife's estate,

against appellees, Mrs. Perkins's treating physicians,[1] alleging that their negligence caused his wife not to receive a life-saving liver transplant. Upon objection by appellees, the trial judge excluded portions of testimony by one of appellant's experts. Without that testimony, appellant conceded that he could not establish causation and the judge granted appellees' motion for a directed verdict. On appeal, appellant alleges that the trial court committed reversible error in excluding his expert's testimony and also by granting the directed verdict. For the reasons discussed herein, we agree and reverse and remand for a new trial.

## I. Background

Beginning in April 2007, Mrs. Perkins's "lab work showed elevation in [her] liver tests." She was being treated by her primary physician Dr. Darcy Hansen and gastroenterologist Dr. Michael Keegan. On May 11, her condition worsened and Dr. Keegan sent Mrs. Perkins to the emergency room at Sibley Memorial Hospital. For reasons not clear from the record, she was discharged the next morning. Unfortunately, however, Mrs. Perkins's condition continued to decline. On May 23, she was admitted to Georgetown University Hospital and after being evaluated

---

[1] One of the treating physicians' practice groups, Metropolitan Gastroenterology Group, P.C., also is an appellee.

was placed on the United Network for Organ Sharing ("UNOS") [2] transplant waitlist two days later. The decision to place patients on the waitlist and in what order of priority generally is determined using a Model for End-Stage Liver Disease ("MELD") score. However, because Mrs. Perkins was diagnosed with "hepatic encephalopathy," a worsening of brain function associated with liver failure, she was designated as "status one" and "placed at the top of the list." From then until she passed away on June 6, there were 44 livers available for her, but they were deemed unsuitable and Mrs. Perkins did not receive a transplant.[3]

Appellant brought a medical malpractice suit against appellees[4] alleging that they "failed to timely recognize that Mrs. Perkins had severe liver failure" and that

---

[2] UNOS is the private, non-profit organization that manages the national organ transplant system, including the waitlist and organ allocation policies. *See* United Network for Organ Sharing, http://www.unos.org/about/index.php (last visited Nov. 4, 2013).

[3] On June 3, 2007, Mrs. Perkins was scheduled for a transplant, but in the operating room it was discovered that "somebody [had] written the wrong blood type," or put another way, there was an "ABO incompatibility," and "the liver was not compatible" and the surgery was not performed. However, according to appellant's expert witness, Dr. Esteban Mezey, at that point the "standard of care is to use ABO incompatible blood."

[4] Appellant also brought suit against Georgetown University Hospital alleging that it was negligent in "fail[ing] to successfully transplant Mrs. Perkins" with the organs that were available "from May 26 until her death on June 6, 2007." Georgetown and appellant reached a confidential settlement.

if she had been admitted sooner to Georgetown University Hospital or another facility that performed transplants, she would have received a liver transplant and survived. At trial, appellant proffered that Dr. Esteban Mezey would offer expert testimony on causation, explaining that it was more likely than not that if Mrs. Perkins had been transferred to a hospital that performed transplants sometime between May 12-14, shortly after she was discharged from Sibley, she would have received a liver transplant and survived. Appellees objected to that testimony because Dr. Mezey did not review the UNOS data on the mean and median wait times for organ transplants for region two,[5] which includes Georgetown University Hospital, arguing that he did not have an adequate foundation for his opinion. The trial judge sustained the objection and excluded Dr. Mezey's testimony on causation.

At the conclusion of appellant's presentation of evidence, appellees moved for judgment in their favor arguing that appellant failed to establish "proximate cause" as a matter of law. Appellant's counsel conceded that without Dr. Mezey's testimony on causation, "there is not sufficient evidence of causation to go to the jury on these issues." Accordingly, the trial judge granted appellees' motion and Mr. Perkins filed a timely notice of appeal.

---

[5] There are eleven "allocation regions" nationwide.

## II.   Discussion

"In a medical malpractice case, the plaintiff must establish the applicable standard of care, [a] deviation from that standard and a causal relationship between the deviation and the injury." *Snyder v. George Washington Univ.*, 890 A.2d 237, 244 (D.C. 2006) (internal quotation marks omitted and alteration in original).  The causal relationship between breach and injury is established through expert testimony "based on a reasonable degree of medical certainty, that the defendant's negligence is more likely than anything else to have been the cause (or a cause) of plaintiff's injuries." *Derzavis v. Bepko*, 766 A.2d 514, 522 (D.C. 2000) (internal quotation marks omitted).  Appellant argues that the trial court erred in not allowing Dr. Mezey to provide testimony on causation.  We review a trial court's decision regarding the admissibility of expert testimony for an "abuse of discretion." *District of Columbia v. Anderson*, 597 A.2d 1295, 1299 (D.C. 1991).  Thus, the trial court's decision will be "sustained unless it is manifestly erroneous." *Coates v. United States*, 558 A.2d 1148, 1152 (D.C. 1989).

Generally, the admission of expert testimony is guided by the three *Dyas*[6] factors. The first and third factors are not at issue here.[7] The second factor requires that the witness have "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference *will probably aid the trier in his search for truth.*" *Id*. at 832 (emphasis in original and internal quotation marks omitted). Implicit in that requirement is that the expert have a "reliable basis for [his] theory" steeped in "fact or adequate data," as opposed to offering "a mere guess or conjecture." *Haidak v. Corso*, 841 A.2d 316, 327 (D.C. 2004) (internal quotation marks omitted).

It is well established that a physician's experience may provide a reliable basis for his or her expert opinion.[8] Here, there is no question that Dr. Mezey's

---

[6] *Dyas v. United States*, 376 A.2d 827 (D.C. 1977).

[7] The first factor asks whether the subject matter of the expert testimony is "beyond the ken" of the average lay juror, while the third factor excludes expert testimony "if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." *Id*. at 832 (internal quotation marks omitted).

[8] *See, e.g.*, *Aikman v. Kanda*, 975 A.2d 152, 161 (D.C. 2009) (holding that "the record amply supports [the trial judge's] reasoning that [the expert's] training and experience rendered him competent to render [expert] testimony"); *Anderson*, 597 A.2d at 1300 (finding "no clear abuse of discretion by the trial judge in ruling that [the expert] was qualified to testify as an expert in podiatry" where he "had training and experience in the area of direct relevance to [the plaintiff's] negligence

(continued…)

skill, knowledge, and experience provided a reliable foundation to testify about the likelihood that Mrs. Perkins would have received a liver transplant and survived if she had been admitted to a transplant facility sooner. Dr. Mezey is board certified in internal medicine and gastroenterology. Since 1982, he has been a professor of medicine at Johns Hopkins University, where he also is "head of the liver section" and where he previously "served as the clinical director of gastroenterology and hepatology."[9] He is "on staff at . . . Johns Hopkins Hospital," where he previously was the chief of hepatology. Dr. Mezey served on the council of "the American Association for the Study of Liver Disease," which "deals with transplant[s]," and also publishes "one of the transplant journals." He also reviews "articles for various journals in the area of livers and transplants."

Dr. Mezey testified that "having worked at Johns Hopkins Hospital for 20 years with transplants, with similar patients and similar conditions" to Mrs. Perkins's, provided a basis for his "understanding as to how quickly patients with

---

(…continued)

claims"); *Rotan v. Egan*, 537 A.2d 563, 570 (D.C. 1988) (finding that the trial court did not abuse its discretion in admitting expert testimony where the expert "had extensive past experience in the field, . . . the witness had a residency in the specialty and . . . he had been an instructor in the field").

[9] Hepatology is the "subspecialty of gastroenterology that specializes in liver diseases."

MELD scores such as [Mrs. Perkins's between May 12 and June 6, 2007][10] are likely or not likely to receive a transplant." Additionally, Dr. Mezey's knowledge "as to the likelihood of livers being available to patients when they come to Georgetown or to Johns Hopkins" was based on "weekly" discussions regarding "what's available" in region two.

Neither appellees nor the trial judge disputed that Dr. Mezey had impressive credentials. Rather, appellees argue that "in the setting where the actual data on the issue in question exists, the witness can and must rely upon this to support an expert opinion"; otherwise, appellees argue, the "expert's experience[] constitutes nothing more than conjecture." Specifically, at trial appellees contended that because Dr. Mezey did not know the UNOS statistics on the median and mean wait times for liver transplants in region two from May 12 to May 23, 2007, "there's a hole in the foundation that is necessary in order for [Dr. Mezey] to give [his] opinion," arguing that because the "data is available" but Dr. Mezey has not "made access to it," his "experience is not enough" to provide a foundation for his

---

[10] Because Mrs. Perkins was not diagnosed with encephalopathy until May 25, her position on the waitlist prior to that date would have been determined by her MELD score. On May 17, Mrs. Perkins's MELD score was 35, which according to Dr. Mezey meant that "she would [have been] pretty much on the top of the list" if she had been at Georgetown or another area hospital that does transplants on that date.

testimony. The trial judge admittedly "struggled" with this ruling, but ultimately was persuaded by appellees' argument.

As a threshold matter, appellees' argument directly conflicts with *Snyder*, in which this court expressly rejected the argument that a doctor's "experience [alone] . . . would not qualify him to offer causation testimony." 890 A.2d at 247 (emphasis omitted). Moreover, what appellees argue and the trial court adopted is, in essence, a requirement that experts must rely on data that will provide the highest degree of certainty or probability in establishing a *prima facie* case of medical malpractice. Yet such a rule cannot stand because it is at odds with the well-established principle that "a particular expert witness's degree of certainty in proffering an opinion goes to the weight of the testimony, not its admissibility, and the weight to be given an expert opinion is for the jury to decide." *Robinson v. United States*, 50 A.3d 508, 523 (D.C. 2012) (internal quotation marks omitted). Thus, the UNOS data, while potentially valuable fodder for cross-examination, became a red herring in assessing the admissibility of Dr. Mezey's testimony.[11]

---

[11] It bears mentioning that the details and utility of the UNOS data are themselves speculative. It is unclear whether there is "actual data" about the mean and median wait times for livers in region two between May 12 and May 23, 2007, because the record does not contain any data from UNOS. Instead, appellees' argument that Dr. Mezey should have been required to testify about "actual data" rests almost entirely on his answer to the question whether he knew if "UNOS

(continued…)

We also reject appellees' argument that Dr. Mezey needed to "provide[] testimony that Ms. Perkins *would have* been offered a suitable liver, and that a surgeon, during that specific time period, *would have* accepted that liver for transplantation." This argument suffers from the same fatal defect as appellees' argument about the UNOS data. It is an elementary principle that the "law does not require the expert to testify that he or she is personally certain that the plaintiff would not have sustained the injuries [or would have received a liver transplant] but for the defendant's negligence." *Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 624 (D.C. 1986).

---

(…continued)

keeps statistics data on median and mean waiting list times for people to get [liver] transplants," to which he replied vaguely, "Yes, they have statistics on everything." Moreover, even if we assume that Dr. Mezey's answer was sufficient to substantiate that UNOS maintains such data, the record does not reveal whether or not the data would show average waiting times in general or wait times for patients who were in similar condition to Mrs. Perkins. Further, appellees repeatedly argued that it was imperative to have the data for region two, yet Dr. Mezey testified in his deposition that when you "have a patient that's very ill . . . with a very high MELD score and the patient is going to die, . . . you do everything possible to get a liver" and "[i]f you can't get a liver in . . . region [two], you may be able to send the patient somewhere else where there's a liver available," noting that there "are many avenues that you can take if you have a very ill patient [who] you assume is going to die," and that he has sent such patients "to Miami, to Tennessee."

Finally, appellant also argues that "the trial court erred in not allowing Dr. Mezey to testify about the loss of a chance occasioned by the delay in transporting Mrs. Perkins to a transplant center." The "loss of chance of survival" doctrine is applicable in medical malpractice cases such as this that "involv[e] negligent treatment of a potentially fatal condition . . . where . . . the harm [alleged] appears to have been brought about by two or more concurrent causes." *Grant v. American Nat'l Red Cross*, 745 A.2d 316, 322 (D.C. 2000) (internal quotation marks omitted and second alteration in original) (quoting *Ferrell v. Rosenbaum*, 691 A.2d 641, 651 (D.C. 1997)).

At trial appellees did not state a basis for their objections to Dr. Mezey's testimony, yet the trial court sustained them, also without explanation. However, on appeal appellees object to Dr. Mezey's testimony that "there [was] a loss of opportunity to get a liver" because "of the delay" in getting Mrs. Perkins to a transplant center, because he lacked "sufficient foundation to support his opinion." For the reasons already discussed, we reject that argument and hold that the trial court erred in rejecting Dr. Mezey's training and experience as sufficient foundation to permit his expert opinion testimony that the eleven-day delay in admitting Mrs. Perkins to Georgetown following her discharge from Sibley caused her to lose the opportunity to obtain a life-saving liver transplant.

### III.    Conclusion

For the foregoing reasons, we reverse the decision of the Superior Court and remand for a new trial.

*So ordered.*